IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **DANIELLE FRANCO,**<br><br>    Plaintiff,<br>v.<br><br>**REVISION SKINCARE,**<br><br>    Defendant | CA No.<br><br>JURY DEMANDED |

PLAINTIFF'S ORIGINAL COMPLAINT

1. PRELIMINARY STATEMENT

1.1. Plaintiff demands a jury for any and all issues triable to a jury. This action seeks declaratory, injunctive, and equitable relief; compensatory, liquidated and actual damages; and costs and attorney's fees for the retaliation and common law claims suffered by Plaintiff, DANIELLE FRANCO, due to REVISION SKINCARE (hereinafter "Defendant" or "REVISION SKINCARE") taking adverse employment actions against her.

1.2 Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory, actual, liquidated and punitive damages; and costs and attorney's fees for the Family Medical Leave interference and retaliation suffered by Plaintiff due to Defendant's actions.

1.3 This action arises under the Family Medical Leave Act.

2. JURISDICTION

2.1. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(a)(4), and the Family Medical Leave Act, and 28 U.S.C. § 1331.

2.2. Jurisdiction is appropriate under the Family Medical Leave Act.

2.3. Declaratory and injunctive relief is sought pursuant to 28 U.S.C. § 2201 and 2202 and the Family Medical Leave Act.

2.4. Actual damages are sought pursuant to the Family Medical Leave.

2.5. Liquidated and injunctive relief is sought pursuant to the Family Medical Leave Act.

2.6. Costs and attorney's fees may be awarded pursuant to 42 U.S.C. § 12205 and Rule 54, FRCP, Family Medical Leave Act.

2.7. Compensatory damages may be awarded pursuant to 42 U.S.C. § 198la(a)(1) and 42 U.S.C. § 198la(a)(2)(b)(1) and the Family Medical Leave Act.

2.8. Punitive damages may be awarded pursuant to 42 U.S.C. § 1981a(a)(1) and 42 U.S.C. § 1981a(a)(2)(b)(1) and the Family Medical Leave Act.

### 3. VENUE

3.1. Venue of this action is proper in this court, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and Plaintiff, at all times while an employee of Defendant resided in this judicial district.

### 4. PARTIES

4.1. Plaintiff is a former employee of Defendant and resides in The Woodlands, Montgomery County, Texas.

4.2. Defendant Revision Skincare is an employer qualified to do business in Texas and employs more than 50 regular employees. Defendant offered and approved Plaintiff's Family Medical Leave under the Family Medical Leave Act and is subject to the statutory provisions of the act, including liability and damages for retaliatory activity stemming from Plaintiff's protected use of the Act. Defendant can be served by serving its registered agent, CT CORPORATION SYSTEM 1999 Bryan St. Ste 900 Dallas, Texas 75201-3136. Summons is requested at this time.

### 5. STATEMENT OF THE CLAIMS

5.1. Background

5.2. Plaintiff began working for Defendant, Revision Skincare, in October 2016. Plaintiff originally turned down the offer due to their maternity leave policy, which at the time was 100% full commissions for 3 months and to receive 60% Short Term Disability (STD) for 6

weeks. Plaintiff's husband and Plaintiff decided that if Plaintiff focused on growing the territory to a significant volume, we could make the maternity leave work by the time we needed the leave. When Plaintiff assumed responsibility for the territory, it was doing $440,000 in sales in a year, which equates to $44,000 in commission for her. As of July 2018, Plaintiff had grown the territory to $702,000 in total yearly sales, $70,200 in commission at the very least- as we are able to make an additional 1% or 2% if we meet champ or super champ goals per quarter.

5.3. Plaintiff has an MBA and a proven track record as an outstanding sales person in this industry.

5.3. In early April 2017, Defendant informed Plaintiff at a National Sales Meeting during a presentation by Human Resources, that they were discontinuing Plaintiff's commission payout for any STD- which would include maternity leave; Plaintiff spoke with Plaintiff's first manager, Delta Davis, about Plaintiff's concerns and she assured Plaintiff she would voice them to upper management.

5.4. On April 27, 2017 Plaintiff received a call from Tracy Dahms (VP of sales) informing Plaintiff that Defendant had posted a job for Houston (Plaintiff sales territory) on LinkedIn. He did not know the actual territory, or the amount Plaintiff would lose to the new representative, but assured Plaintiff would not lose Plaintiff top 2 accounts- Suzanne Bruce and Associates and Bellaire Dermatology (combined sales volume of $150k+). Plaintiff called Delta immediately, who was unaware of these new territory changes. Over the course of the next few weeks, she was able to convince Mr. Dahms to focus on other areas of the nation and the job posting was removed.

5.5. In May 2017 Plaintiff first manager, Delta Davis, was terminated and Plaintiff was realigned to the West team under Plaintiff second manager, Misty McDonald.

5.6. In July 2017, Plaintiff's second manager began recruiting for a new Houston South territory; Misty did not know the territory or history well, as she had just assumed

responsibility for Plaintiff area; Plaintiff reiterated to her that Tracy had assured Plaintiff that Plaintiff would not lose Suzanne Bruce and Associates and Bellaire Dermatology.

5.7. In late August 2017, Hurricane Harvey hit and the territory split was postponed until further notice.

5.8. In December 2017, Defendant terminated Plaintiff's second manager, Misty McDonald.

5.9. In January 2018, Defendant hired Plaintiff third manager, Amber Dawson. Ms. Dawson worked with Mr. Dahms at a previous company, Galderma. Plaintiff informed Ms. Dawson in our first one-on-one meeting that Plaintiff was concerned by Defendant's current lack of maternity leave policy and about the details of Plaintiff territory changes.

5.10. In February 2018, Defendant sent an email through Human Resources announcing an enhanced maternity leave plan to include 100% paid commissions for 2 months and 60% of base pay through STD.

5.11. Over the course of March through April 2018, Plaintiff had multiple conversations with Plaintiff's new manager, Amber Dawson, regarding Plaintiff territory. Ms. Dawson assured Plaintiff that the benefit of having a manager from Houston is that she understands it cannot be split using Interstate -10 as a divider and needed to be divided based on individual zip codes. Ms. Dawson reaffirmed that Plaintiff would not lose Suzanne Bruce and Associates and Bellaire Dermatology. Ms. Dawson assured Plaintiff the new territory would be a very small growth territory where the new person would be expected to be a "hunter/gatherer." Ms. Dawson reiterated that they wanted Plaintiff to be involved in the process and although they did not want the accounts to be "cherry picked," she asked if there were specific accounts that Plaintiff would want to continue to work with. Plaintiff responded that in addition to Suzanne Bruce and Associates and Bellaire Dermatology, Bay Area Aesthetics in Webster would have a difficult time transitioning to a new

representative. She said she would note this and referred back to this account and their wishes several more times.

5.12. <u>The notice of pregnancy and protected request for Family Medical Leave</u>

On March 23, 2018, Plaintiff sent an email to Ms. Dawson and Human Resources notifying them of Plaintiff pregnancy.

5.13. Continuously from April 2018 through July 2018, Plaintiff contacted Defendant and begged to know the monetary amount of sales Plaintiff would be losing, especially as Plaintiff was trying to prepare for maternity leave and Plaintiff's family relies on her income. Defendant wholly failed to answer Plaintiff in phone calls or conference calls.

5.14. The chronology follows:

5.15. On April 5, 2018, Ms. Dawson and Plaintiff had a conference call to discuss the Houston Territory plan. Ms. Dawson confirmed that Defendant is posting the new position and wanted Plaintiff to know first; however, she said she had no other details. Ms. Dawson did tell Plaintiff that that she knows that Suzanne Bruce and Associates and Bellaire Dermatology are to remain in Plaintiff territory. She told Plaintiff that she would "include Plaintiff in the process". She had Plaintiff complete a territory analysis of the accounts Plaintiff would like to keep. Ms. Dawson failed to ever mention this report to Plaintiff again.

5.16. On April 27, 2018, Ms. Dawson announced to our West Team that Defendant had an opening in Houston and asked for referrals. Plaintiff recommended Deni Lathrop, a colleague from Bellaire Dermatology, who followed up and called Mr. Dahms regarding the position, as she had previously met Mr. Dahms through a speaking engagement Plaintiff had arranged for Plaintiff territory- where she spoke to prospective accounts about business management.

5.17. On April 30, 2018, Ms. Lathrop spoke with Mr. Dahms regarding the open position- and he told her that he was unsure of the exact territory value that would be taken away from

Plaintiff, but it was very small- between $100-110k in total sales. This is consistent with what Defendant had alluded to before Plaintiff announced she was pregnant.

5.18. On May 17, 2018, Ms. Lathrop interviewed with Ms. Dawson and Ms. Dawson told her that the territory is very small and that she would be given around $150-$180k of Plaintiff's territory.

5.19. On June 11, 2018, Ms. Dawson scheduled a teleconference for Plaintiff, herself and Mr. Dahms. Ms. Dawson remained silent for the majority of call while Mr. Dahms lined out the expansion plan and the example for compensation as follows: based on a $300,000 territory- the representative is to lose $100,000 in total sales or $10k in commission annually. The representative's base salary is increased $5k, so $5k is deducted from the $10k loss. The remaining $5k is annualized out for one year and paid for six months. $416 is paid to the representative monthly for six months to help them rebuild their territory back. Plaintiff's response was that this is a low value and only represents 75 cents on the dollar for the loss. Plaintiff asked if larger territories would receive larger increases and Mr. Dahms replied that they would not and that the increase to the base salary is a hard five thousand dollars. The viability of this plan depends greatly on the amount of dollars that need to be rebuilt in that timeframe. Considering it took Plaintiff almost 2 years to grow $260,000, Plaintiff could not accurately valuate if this plan was realistic without knowing the amount of loss that would need to be recuperated. Mr. Dahms informed Plaintiff that he would get Plaintiff's territory split numbers to her by Friday, June 15, 2018. He wholly failed to do so.

5.20. On June 12, 2018, at Ms. Dawson's urging. Plaintiff sent a follow up email to Mr. Dahms requesting to meet while she was headquarters on June 18 and 19th. Plaintiff told Mr. Dahms that not knowing the financial impact of the territory change is stressful to her. Mr. Dahms replied quickly saying not to stress and that he has more details for Plaintiff. Mr.

Dahms then called Plaintiff at 5:30 p.m. and told Plaintiff that Plaintiff will now lose $250,000 of her sales in this territory change. Plaintiff became very upset with this new information, which is a significantly greater loss to Plaintiff and Plaintiff's family financially than before Plaintiff announced that Plaintiff was pregnant. Under Mr. Dahms' proposed plan, Plaintiff would stand to lose $25,000 in commissions annually. Plaintiff's base pay would increase $5,000, so $5k would be deducted from the $25,000 loss. The remaining $20,000 would be annualized out for 1 year and $1,667 would be paid to Plaintiff for 6 months to help Plaintiff rebuild the loss.

5.21. On June 14, 2018, Plaintiff spoke with Defendant's CEO, Maria Carell, and she told Plaintiff that she understood that Plaintiff was very upset by this newly disclosed compensation plan that hurts Plaintiff and Plaintiff's family. Plaintiff told her that she had concerns with the impact on the maternity leave plan and that it is very unfair towards Plaintiff when she was seven and a half months pregnant as Plaintiff's husband and Plaintiff took this maternity leave compensation plan into consideration when planning ahead. To Plaintiff's shock, Ms. Carell said that no one had informed her that Plaintiff was pregnant. Ms. Carell told Plaintiff this was a special situation and needed to be handled individually and that she would speak with Mr. Dahms about it. Ms. Carell congratulated Plaintiff and understood Plaintiff's concerns, as she was also the primary income in her family. Plaintiff closed by telling her that the six-month payout would be ending as Plaintiff return from maternity leave and just when Plaintiff's childcare bills would double. She agreed that something needed to be worked out especially for Plaintiff. She suggested that the compensation change might have to be put on hold while Plaintiff was out so that Plaintiff had more time to re-grow Plaintiff territory upon Plaintiff return.

5.22. On June 14, 2018, Mr. Dahms called Plaintiff in the early evening with a new plan, which would be in effect for all representatives whose territories are being split. The base salary would be increased to $10k. This amount would not be backed out of the commission loss

from the split territory now. If territory loss is $10k, that is annualized out for 1 year and paid for nine months instead of six. Plaintiff informed Mr. Dahms of her discussion with Ms. Carell and her suggestion that Plaintiff plan be put on hold for maternity. Mr. Dahms says he will have to look into it and get back to Plaintiff. This was not revisited again until a July 30th conference call with HR and as of 08-09-18, the complete details of the payout plan remain unknown.

5.23. Plaintiff was in Dallas from June 17-18 for Advanced Training and while Plaintiff spent two days with Mr. Dahms and upper management, Plaintiff's territory issues were never addressed.

5.24. On June 30, 2018, Mr. Dahms congratulated Plaintiff in an email for making her goal in Q2. Plaintiff was one of five representatives in the region to hit her "Champ" goal and Plaintiff also opened a record number of new accounts in the quarter (13).

5.25. On July 12, 2018, Plaintiff had a one-on-one call with Ms. Dawson to discuss Plaintiff's action plan for Q3. Ms. Dawson said she has been pushing for the territory split numbers and there was a hold up in the software. She said she asked Tracy for a hard deadline of July 13, 2018, which didn't look like it would be met. Plaintiff offered to work with the new representative on a proposal for how to split the territory, as we both understand the customers and their unique needs. Plaintiff explained that if they can just give us the number breakdown between North and South, we would work it out to where it works out for everyone. Defendant denied this request. Plaintiff still had many questions regarding Plaintiff's commissions and maternity leave and the dates on which these commissions would be paid. Ms. Dawson suggested that Plaintiff email HR and copy her for answers. Plaintiff did so on this day.

5.26. On July 17 and 18, 2018, Defendant held a regional meeting held in The Woodlands- where Mr. Dahms, Ms. Dawson, Ms. Carell and Plaintiff were all in attendance. These three upper management individuals still had no word for Plaintiff on the details of

      Plaintiff's territory. After the regional meeting, Plaintiff had a meeting with a customer and their CEO. Ms. Dawson had set it up so that the CEO (Ms. Carell) rode with Plaintiff, as she wanted Plaintiff to discuss our maternity leave plan with Ms. Carell during this time.

5.27. On July 19, 2018, Human Resources had still failed to reply to Plaintiff's email with answers to Plaintiff's questions from July 12, 2018. Plaintiff resent the email.

5.28. On July 20, 2018, Ms. Dawson had previously scheduled a call for 11am with herself and Mr. Dahms to discuss the North Houston Territory. Mr. Dahms was unable to attend the call. Ms. Dawson proceeded to tell Plaintiff it is a $330/$370 split; that Plaintiff would be losing the majority of her territory which is also the majority of Plaintiff compensation. Plaintiff immediately began to hyperventilate, cry and run through a range of emotions. Plaintiff asked about Suzanne Bruce and Associates and Bellaire Dermatology, Plaintiff two largest accounts that Defendant had promised Plaintiff would not lose before Plaintiff announced Plaintiff was pregnant. Ms. Dawson now told Plaintiff she had to call Dr. Teller (owner of Bellaire Dermatology) herself and that it was his request to have his former employee, Deni Lathrop, handle his account instead of Plaintiff. Ms. Dawson said she was worried about Plaintiff and would make some calls to see what she could find out and call Plaintiff back that afternoon. She never called Plaintiff back that day.

5.29. Plaintiff understood that the new representative taking part of Plaintiff's territory, Deni Lathrop, was given an offer from Ms. Dawson outlining that her territory value was $359,000.

5.30. Later that day, Plaintiff texted Ms. Dawson apologizing to her for receiving the brunt of Plaintiff's emotional reaction to a decision to take away the majority of Plaintiff's territory and Plaintiff's ability to support her family, a decision that likely wasn't hers. Plaintiff thanked her for listening and supporting Plaintiff.

5.31. On July 23, 2018, after Plaintiff emailed Ms. Dawson a list of questions regarding territories and sales and compensation, she responded with a call to Plaintiff around 4 pm.

In that call, she told Plaintiff that Plaintiff would receive an account list with details and numbers in the next few minutes and that Plaintiff would have all answers to compensation by Friday. She also stated that Plaintiff would be receiving a warning letter regarding Plaintiff's communications. She confirms that Plaintiff will get credit for all sales for the entire city of Houston through July 31. Plaintiff replied okay. At 5:02pm, Plaintiff receive a reply from HR to Plaintiff's questions initially sent on July 12.

5.32. On July 24, 2018 Ms. Dawson sent Plaintiff new quarterly goals, $115,000 for champ and $120,000 for super champ for Plaintiff's half of Houston. The goal prior to the split was $225,000 and $235,000. The split represented 48% for Plaintiff and 52% for Deni, the new representative. Plaintiff now had even more questions - why was Plaintiff given more than 48% of the goal? After, Plaintiff confirmed with Ms. Dawson that the sales that Plaintiff made in South Houston for July would be backed out of Plaintiff's number and would not be applied towards Plaintiff's ability to make champ and super champ goals. Plaintiff wanted to know why not, since Plaintiff sold them in the quarter.

5.33. On July 24, 2018, Plaintiff began communicating the changes in representatives to Plaintiff's customers, as per Ms. Dawson's instructions in our July 23rd phone call. The marketing manager from Suzanne Bruce and Associates, Maite Uribe, called Plaintiff immediately and said they're doing this to you because you're pregnant.

5.34. On July 26, 2018, Maite Uribe, marketing manager from Suzanne Bruce and Associates (the largest Revision account in Houston) sent Ms. Dawson an email regarding her concerns about the changes, as the new representative had been the COO of their largest competitor in Houston, Bellaire Dermatology, and they did not want her privy to the inner workings of their organization.

5.35. On July 27, 2018, Ms. Dawson emailed Plaintiff scheduling a Monday conference call with Human Resources to go over Plaintiff commission options. For the first time, Plaintiff was directed that a Skype video-conference was going to be mandatory for this call. Within an

hour of receiving the call invite, Human Resources had sent Plaintiff an email with only 2 options.

5.36. On July 28, 2018 Epris Althen, Director for Amerejuve and one of Plaintiff's larger clients with multiple locations, reaches out to Ms. Dawson via email with concerns regarding the new representative situation and explains that she chose Revision because she doesn't want to deal with multiple representatives. Because they have locations in Texas and Georgia, she already has 2 representatives for her Revision account, and she prefers to not have to work with a 3rd.

5.37. On July 30, 2018, Plaintiff had a conference call to go over both compensation options. Plaintiff ask for an Option 3 to be considered which would allow for Plaintiff to receive credit now – considering I'm actively growing Plaintiff's territory for August and September- and have it hold while I'm on maternity leave. Regena in Human Resources says she will need to confirm with counsel and get back with Plaintiff. Regena was unable to clarify the monetary value of the payments. Regena told Plaintiff she will get back with Plaintiff that day and when she did, she informed Plaintiff that she will not have a number until end of the month. This value remains unconfirmed as of 08-09-18.

5.38. On July 31, 2018, Plaintiff spoke with Maite from Suzanne Bruce's office. Maite told Plaintiff she spoke with Ms. Dawson and was told that Plaintiff was not an option for them as a representative because Plaintiff's territory was North Houston and it was much too far for Plaintiff to travel. Suzanne Bruce and Associates is 39 miles from Plaintiff's house; however, Plaintiff had customers in the same vicinity as Suzanne Bruce and Associates that are 41 miles from Plaintiff's home. Ms. Dawson told Maite that Plaintiff was being well compensated and not to worry about Plaintiff. Maite said she found that statement odd, as she never inquired as to Plaintiff's personal compensation.

5.39. This arrangement is contrary to Bellaire Dermatology, as they were allowed to request their own representative. That representative is not pregnant. This is also contrary to the

assurances and promises Defendant made to Plaintiff prior to Plaintiff informing them Plaintiff was pregnant.

5.40. Defendant only gave two options to Suzanne Bruce's office -to have Ms. Dawson (Plaintiff's manager) as their representative or to give the new representative a try.

5.41. Amerejuve informed Plaintiff that Ms. Dawson said Plaintiff did not have time to service their accounts because they are too far. This is not true. Ms. Dawson gave Amerejuve the option of becoming an inside-sales account; Amerejuve's contact was very angry with her response and as of 08-09-18 is still awaiting a final decision.

5.42. After Plaintiff informed Defendant that she was pregnant, they have taken away the majority of Plaintiff's sales volume, taken away Plaintiff's two largest accounts, told blatant lies to Plaintiff's customers, reduced Plaintiff's compensation and ability to meet goals and reach larger percentage valuations.

5.43. Defendant's negligence in relaying Plaintiff's territory loss to Plaintiff has made it impossible for Plaintiff's husband and her to make up a $36,000.00 loss in the eighth month of Plaintiff's pregnancy.

5.44. Defendant's adverse actions have not only hurt Plaintiff's family financially in a dramatic and negative way, Defendant has caused Plaintiff's significant mental anguish in the 8th month of Plaintiff's pregnancy. Some of this mental anguish has manifested physically and caused even more anxiety and worry over Plaintiff's health and the health of her then unborn child.

5.45. In fact, given Plaintiff's base salary and very hard work over the last two years Plaintiff significantly built up her territory. Had Defendant not treated Plaintiff adversely Plaintiff was on track to be at an additional 2% commission next year. This would have put Plaintiff at a total of $185,000.00 per year between Plaintiff's base salary and commission. Defendant's actions interfered with that potential.

5.46. On August 13, 2018, Plaintiff gave Defendant notice of Plaintiff's protected discrimination and retaliation, both disability and FMLA related) claims and opposition to discrimination and subsequently filed those claims with the EEOC and the Texas Workforce Commission- Civil Rights Division.

5.47. <u>The retaliation.</u>

After Plaintiff engaged in protected actions and gave notice to Defendant, Defendant retaliated against Plaintiff with the following adverse actions.

5.48. Defendant's retaliatory actions included taking away Plaintiff's guaranteed "transition commission" of no less than $5,850.00 per month that they promised prior to the protected EEOC filing.

5.49. Defendant commission payments to Plaintiff through October 2018 failed to meet that promised $5,850.00 amount.

5.50. Defendant failed to pay Plaintiff the $1,000 referral fee for an employee Plaintiff referred who remains employed. Prior to Plaintiff EEOC filing, Plaintiff was told she would receive this payment while on maternity leave.

5.51. Defendant failed to provide Plaintiff with the support and backup for Plaintiff's October commissions, after multiple requests to multiple people. October was a record month company-wide and Defendant's lack of transparency leaves Plaintiff unable to ascertain if Plaintiff's commissions were correct.

5.52. Defendant provided Plaintiff with FMLA paperwork for her and her healthcare provider to complete and return. Based on Defendant's representation that Plaintiff was covered for FMLA she and her healthcare provider completed and returned that paperwork assuring Plaintiff of her protected medical leave. Plaintiff relied on Defendant's representation that she was on that protected medical leave. Defendant delayed completion of their portion of Plaintiff's Short-Term Disability paperwork and failed to respond to Plaintiff's case

manager's requests for completion. This caused a more than 2-week delay in receiving Plaintiff paycheck for Short-Term Disability that Plaintiff family relies on.

5.53. In July 2018, Plaintiff spoke with Ms. Dawson requesting vacation time off during the upcoming vacation for Plaintiff's family's annual Christmas trip. Ms. Dawson told Plaintiff that Plaintiff should know that she does not nitpick over days off if Plaintiff is making her numbers. Plaintiff reminded Ms. Dawson that Plaintiff would be coming off maternity/medical leave and that numbers would not be coming into play. Plaintiff followed up by sending an email to Human Resources who informed Plaintiff that she would be able to take time (in the form of non-vacation days) with her manager's approval.

5.54. Based on these discussions and assurances, Plaintiff booked and paid for travel for Plaintiff's family's annual Christmas trip.

5.55. After returning from her protected status leave on December 3, 2018, Plaintiff was informed that she still had 72 vacation hours remaining in the system.

5.56. Despite this information and previous assurances, Ms. Dawson then informed Plaintiff that she could not take time off to be with her family for her preplanned Christmas trip on December 27 and 28, 2018 and January 2 and 3, 2019. Ms. Dawson warned Plaintiff that if she did take the time off Plaintiff would be disciplined, which Plaintiff understood could include termination.

5.57. Ms. Dawson told Plaintiff this after specifically reminding Plaintiff, Plaintiff had been on *medical leave.* [emphasis hers].

5.58. Also, after Plaintiff returned from protected status on December 3, 2018, Ms. Dawson began requiring Plaintiff to do a routing report. Ms. Dawson does not do this for other reps who have not taken protected leave or who have opposed discrimination.

5.59. Ms. Dawson also furthered retaliated against Plaintiff by requiring Plaintiff to submit a report at the end of every week outlining what Plaintiff have accomplished for the week. Ms. Dawson does not require this report for reps who have not taken protected leave.

5.60. On December 20, 2018, Ms. Dawson sent an email to Plaintiff and the VP of Sales stating that Plaintiff did not turned in an assignment that was due on December 7. Ms. Dawson assigned this task to the team on November 15, 2018. Therefor Ms. Dawson had not notified Plaintiff of the task or deadline. When Plaintiff returned from medical leave on December 3, 2018, she and Ms. Dawson met and Ms. Dawson sent her a very detailed email listing all expectations, deliverables and due dates. Ms. Dawson wholly failed to notify Plaintiff of this particular task. After failing to notify Plaintiff about this task and deadline, Ms. Dawson gave her three days to complete it (the day after Christmas) all the while failing to acknowledge that she never gave her the task in the first place and that Plaintiff could not miss a deadline for an assignment for a deadline or deliverable that Ms. Dawson never gave her. Instead of telling the truth, Ms. Dawson portrayed Plaintiff to the VP of Sales as missing a deadline without informing him of her mistake. (It is important to note Ms. Dawson gave the rest of the team 17 days to complete the assignment.

5.61. Ms. Dawson stated in Plaintiff's AE expectations that Plaintiff achieve Champ and Super Champ goals for the quarter, **despite** the fact that Plaintiff was on Federally protected Family Medical Leave for 1/3 of the time. This caused Plaintiff to fear that she would be placed on a performance improvement plan, or worse, should Plaintiff not meet these unreasonable and retaliatory expectations.

Ms. Dawson also asked Plaintiff she was "all in?" Plaintiff assumed that was a reference to her having been on Federally protected Family Medical Leave and now returning. For some reason, Ms. Dawson chose that time to send Plaintiff a PowerPoint containing Revision's Missions, Visions, and Values.

5.62. Defendant's retaliation and continued discrimination against Plaintiff have made it unreasonable for Plaintiff to continue working for them and have forced Plaintiff to resign.

5.63. <u>Family Medical Leave Act Retaliation</u> - Based on the above facts, Defendant violated the Family Medical Leave Act and retaliated against Plaintiff for engaging in a protected

activity. The above-described actions of Defendant were so outrageous in character and so extreme in degree that they exceeded all possible bounds of decency and can only be regarded as atrocious and utterly intolerable in a civilized community.

5.64. As a direct and proximate result of the aforementioned arbitrary and capricious acts, the Plaintiff has suffered grievous harm, including but not limited to, humiliation and embarrassment among co-workers, customers and others sustained damage to Plaintiff's credibility and sustained damage to Plaintiff's prospects for future employment.

## 6. PRAYER

6.1. WHEREFORE, Plaintiff prays the Court order to award such relief including the following:

    6.1.1. Declare Defendant's conduct in violation of Plaintiff's rights;

    6.1.2. Enjoin the Defendant from engaging in such conduct;

    6.1.3. Award Plaintiff actual damages;

    6.1.4. Order Defendant to pay Plaintiff back pay and front pay and benefits;

    6.1.5. Award Plaintiff compensatory damages for mental anguish;

    6.1.6. Award Plaintiff punitive damages to be determined by the trier of fact;

    6.1.7. Grant Plaintiff pre-judgment and post-judgment interest;

    6.1.8. Order Defendants to pay Plaintiff's costs and attorney's fees in this action; and,

    6.1.9. Order and grant such other relief as is proper and just.

Respectfully Submitted,

/s/ *Ellen Sprovach*
Ellen Sprovach
USDC SD/TX No. 22202
Texas State Bar ID 24000672
ROSENBERG | SPROVACH
3518 Travis Street, Suite 200
Houston, Texas 77002
(713) 960-8300
(713) 621-6670 (Facsimile)
ellen@rosenberglaw.com
Attorney-in-Charge for Plaintiff

OF COUNSEL:
ROSENBERG | SPROVACH

ATTORNEYS FOR PLAINTIFF